[Crim. No. 2390. In Bank.—September 12, 1921.]

In the Matter of HEIKICH TERUI on Habeas Corpus.

[1] UNITED STATES GOVERNMENT — TREATY-MAKING POWER — POWERS RESERVED BY STATES.—While the government of the United States is a government of delegated powers, the states retaining such powers as they have not delegated or surrendered to it, the people of the several states have surrendered the whole treaty-making power to the federal government, and vested it in the President and Senate of the United States (sec. 2, art. II, U. S. Const.), and have expressly excluded each state from all power in this regard (sec. 10, art. I, U. S. Const.).

[2] ID.—TREATIES — SUPREME LAW.—As to all matters within the treaty-making power conferred by the federal constitution, a treaty entered into on the part of the United States by the President with the concurrence of two-thirds of the United States Senate is a part of the supreme law of the land, binding on all states and to which all state enactments in conflict therewith must yield.

[3] TAXATION—ALIENS—PREVENTION OF DISCRIMINATION—PROPER SUBJECT FOR TREATIES.—The protection which should be afforded to the citizens of one country residing in another against discrimination in matters of taxation based solely on their alien citizenship is a proper subject of negotiation between our government and the government of other nations.

[4] UNITED STATES GOVERNMENT—TREATIES—TERRITORIES.—The word "territories" used in article I of the treaty between the United States and Japan was undoubtedly used as meaning the entire domain over which dominion was exercised by each of the sovereign nations, which, of course, in so far as the treaty-making power was concerned, included all of the states of the United States.

[5] ID.—ALIEN POLL TAX LAW—INVALIDITY OF.—In view of the provisions of the existing treaty between the United States and Japan, providing, among other things, that the citizens or subjects of

neither shall be compelled, under any pretext whatever, to pay any charges or taxes other or higher than those that are or may be paid by native citizens or subjects, the alien poll tax law of California is ineffective for any purpose with relation to any citizen of Japan.

APPLICATION for Writ of Habeas Corpus to discharge petitioner held in custody for failure to register under the alien poll tax law. Petitioner discharged.

Albert H. Elliot and Guy C. Calden for Petitioner.

U. S. Webb, Attorney-General, for Respondent.

ANGELLOTTI, C. J.—The petitioner, an alien male inhabitant of the state of California of the age of about thirty-five years and a subject of the empire of Japan, is held in custody by the chief of police of the city of Oakland, upon a complaint charging him with having failed to register as required by the terms of an act of the legislature, entitled "An act to add a new chapter to title nine of part three of the Political Code, to be numbered chapter nine thereof, embracing sections three thousand eight hundred thirty-nine to three thousand eight hundred fifty-six, both inclusive, providing for the levy and collection of poll taxes pursuant to the provisions of section twelve of article thirteen of the state constitution as adopted November 3, 1920," enacted at the legislative session of 1921.

This act, commonly known as the alien poll tax law, provides that "every alien male inhabitant of this state over twenty-one years of age and under sixty years of age, except paupers, idiots and insane persons, must annually pay a poll tax of ten dollars, . . . " In the year 1921 this tax becomes due and payable on the first day of August, and delinquent if not paid on or prior to December 1st. It contains provisions requiring "every person liable to pay such poll tax" to register as provided in the act, such registration in the year 1921 to be effected on or before July 31st.

As is stated in the title to the act, it was enacted pursuant to the mandate of section 12 of article XIII of the constitution as amended under the initiative provisions of our constitution, at the general election of 1920. Prior to

the amendment, this section of the constitution was as follows: "No poll tax or head tax for any purpose whatsoever shall be levied or collected in the state of California." By the amendment of 1920 it was made to read as follows: "The legislature shall provide for the levy of an annual poll tax, and the collection thereof by assessors, of not less than four dollars on every alien male inhabitant of this state over twenty-one and under sixty years of age, except paupers, idiots and insane persons. Said tax shall be paid into the county school fund in which county it is collected."

The legislation, both in the constitution and the act, is purely for· revenue purposes, an exercise solely of the power of taxation, and contains nothing in the nature of an exercise of the police power of regulation, the provisions relative to registration being solely for the purpose of facilitating the collection of the tax from those liable therefor, and merely incidental to the matter of collecting the tax. It is indeed expressly declared in section 2 of the act that it is one "providing for a tax levy," and, therefore, that it "shall take effect immediately." It is provided in the act that "every person subject to the payment of the poll tax hereby imposed who shall, 1. Fail, neglect, or refuse to register as herein provided" shall be "guilty of a misdemeanor, and, upon conviction thereof, shall be punished in the manner provided by law." It should be noted that under our laws no poll tax or capitation tax, or its equivalent, is levied upon citizens of the state.

Petitioner seeks his discharge from custody, claiming that the complaint fails to state a public offense.· His specific claims in this regard are, first, that the act is entirely ineffective as to all aliens who are subjects of the empire of Japan in view of a provision in the existing treaty between this country and the empire of Japan, proclaimed April 5, 1911, and, second, that the act is void as to all alien inhabitants of the state, in that it denies to persons within the jurisdiction of the state the equal protection of the laws, in violation of a provision of section 1 of article XIV, amendments to the constitution of the United States.

As to the first claim, viz., that the act is ineffective as to all aliens who are subjects of the empire of Japan in view of a provision in the existing treaty between this country

and the empire of Japan, proclaimed April 5, 1911 (37 Stat. 1504).

Article I of this treaty, after providing that "the citizens or subjects of each of the High Contracting Parties shall have liberty to enter, travel and reside in the territories of the other to carry on trade," etc., "and generally to do anything incident to or necessary for trade upon the same terms as native citizens or subjects, submitting themselves to the laws and regulations there established," provides:

"They shall not be compelled, under any pretext whatever, to pay any charges or taxes other or higher than those that are or may be paid by native citizens or subjects.

"The citizens or subjects of each of the High Contracting Parties shall receive, in the territories of the other, the most constant protection and security for their persons and property, and shall enjoy in this respect the same rights and privileges as are or may be granted to native citizens or subjects, on their submitting themselves to the conditions imposed upon the native citizens or subjects."

It is, of course, obvious that the alien poll tax law of California does, without any pretext whatever, require Japanese subjects, as well as all other aliens, to pay taxes both other and higher than those required to be paid by citizens of the United States. No poll tax or its equivalent is required to be paid by the latter, and the alien is liable equally with the citizen for all other kinds of taxes imposed, with the result that this poll tax is an additional tax imposed solely by virtue of his being an alien. It would seem also that the effect of such a tax would be that the alien is not allowed to enjoy in respect to "the most constant protection and security for their persons and property," the "same rights and privileges as are or may be granted to native citizens . . . , on their submitting themselves to the conditions imposed upon the native citizens . . . ". No one can fairly dispute that the act openly and avowedly discriminates against alien residents in the matter of taxation for revenue purposes.

It cannot be disputed at this stage in our history that if these provisions of the treaty were intended to be applicable in the several states of the United States, as well as in its other territorial possessions, and are within the proper scope of the treaty power of the United States, they render our

alien poll tax absolutely ineffective as against alien residents who are Japanese citizens or subjects. Certain propositions with relation to treaties between the United States and other nations are now so thoroughly settled, in view of express constitutional provisions and the decisions thereunder, that they are practically elementary law. [1] While the government of the United States is a government of delegated powers, the states retaining such powers as they have not delegated or surrendered to it, the people of the several states have surrendered the whole treaty-making power to the federal government, and vested it in the President and Senate of the United States (sec. 2, art. II, U. S. Const.), and have expressly excluded each state from all power in this regard (sec. 10, art. I, U. S. Const.). They have further expressly declared in the federal constitution as follows: "This Constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the Judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding." (Sec. 2, art. VI.)

[2] From the first decision of the supreme court of the United States upon this subject rendered in 1796 (*Ware* v. *Hylton,* 3 Dall. (U. S.) 199, [1 L. Ed. 568]), to the present day, it is uniformly declared, as the express language of the federal constitution unequivocally- requires, that as to all matters within the treaty-making power conferred by the federal constitution, a treaty entered into on the part of the United States by the President with the concurrence of two-thirds of the United States Senate, is a part of the supreme law of the land, binding on all states and to which all state enactments in conflict therewith must yield. (See *Geofroy* v. *Riggs,* 133 U. S. 258, 266, [33 L. Ed. 642, 10 Sup. Ct. Rep. 295]; *Hauenstein* v. *Lynham,* 100 U. S. 483, [25 L. Ed. 628, see, also, Rose's U. S. Notes].) As was said in *Ware* v. *Hylton, supra:* "It is the declared will of the people of the United States that every treaty made by the authority of the United States shall be superior to the constitution and laws of any individual state, and their will alone is to decide. If a law of a state, contrary to a treaty, is not void, but voidable only by a repeal or nullification by

a state legislature, this certain consequence follows, that the will of a small part of the United States may control or defeat the will of the whole.'' As was said in *Hauenstein* v. *Lynham, supra,* ''it must always be borne in mind that the constitution, laws, and treaties of the United States are as much a part of the law of every state as its own local laws and constitution.'' The learned attorney-general, of course, does not dispute these well-settled propositions.

It is suggested, however, that the subject here covered by the treaty, including as it does matters relative to the exercise of their sovereign power of taxation by the several states, is not within the proper scope of the treaty-making power conferred by the people in the federal constitution. It is to be noted at once that the treaty provisions in no degree purport to limit the several states in the matter of imposing or collecting taxes, except simply to require that in such matter there shall be no discrimination as against Japanese citizens residing therein, the express provision with regard to taxes being that neither American citizens residing in Japan nor Japanese citizens residing in America shall be compelled ''to pay any charges or taxes other or higher than those that are or may be paid by native citizens or subjects.'' This is simply a provision to prevent discrimination on the part of one against the subjects of the other residing in its territory, placing in so far as the kind and amount of taxes are concerned native citizens and the subjects of the other nation upon an equal footing.

It may at once be conceded for all the purposes of this case that there are matters without the proper scope of the treaty power of the United States, matters which could not fairly be held to be included in the grant of that power by the people of the several states to the federal government. We are aware of no decision of the supreme court of the United States by which a treaty provision has been declared to be beyond the treaty power, but it may fairly be claimed that there are such matters. But that the treaty-making power includes such matters as are covered by the provisions here involved cannot be seriously questioned. The rule, as declared in *Geofroy* v. *Riggs,* 133 U. S. 258, 266, [33 L. Ed. 642, 10 Sup. Ct. Rep. 295, 297, see, also, Rose's U. S. Notes], by the supreme court of the United States, the ultimate authority on such a question

is that "the treaty power of the United States extends to all proper subjects of negotiation between our government and the governments of other nations," and, with regard to such matters, is "in terms unlimited except by those restraints which are found in that instrument against the action of the government or of its departments, and those arising from the nature of the government itself and of that of the states." The court there said that it would not be contended that it extends so far as to authorize what the constitution forbids, or a change in the character of the government or in that of one of the states, or a cession of any portion of the territory of the latter, without its consent. The court then said: "But with those exceptions [i. e., those stated in portion last above quoted] it is not perceived that there is any limit to the questions which can be adjusted touching any matter which is properly the subject of negotiation with a foreign country," citing cases including our own case of *People* v. *Gerke,* 5 Cal. 381. In *Geofroy* v. *Riggs, supra,* it was held that it was clear that the protection which should be afforded to the citizens of one country owning property in another, and the manner in which that property may be transferred, devised, or inherited, are fitting subjects for such negotiation and of regulation by mutual stipulations between the two countries. (See, also, in this connection, *Hauenstein* v. *Lynham,* 100 U. S. 483, 489, 490, [25 L. Ed. 628, see, also, Rose's U. S. Notes].) [3] It seems to us to be too clear to admit of argument that the protection which should be afforded to the citizens of one country residing in another against discrimination in matters of taxation based solely on their alien citizenship is a proper subject of negotiation between our government and the governments of other nations, and that there is nothing in the provisions under discussion that was beyond the treaty power of the United States.

We have assumed thus far, contrary to a suggestion of the learned attorney-general, that the provisions of the treaty here involved must be construed as applicable to the several states of the United States, as well as in its other territorial possessions. As to this there cannot be the slightest doubt. There is no word in the treaty to indicate an intention to make such an unreasonable limitation on its provisions relating to the rights of the citizens of one

nation "in the territories of the other," and one so contrary to the whole intent and purpose of a treaty between sovereign nations. [4] The word "territories" used in article I of the treaty was undoubtedly used as meaning the entire domain over which dominion was exercised by each of the sovereign nations, which, of course, in so far as the treaty-making power was concerned, included all the states of the United States.

[5] There is no possible escape from the conclusion that, in view of the provisions of the existing treaty between the United States and Japan, the alien poll tax law is ineffective for any purpose with relation to any citizen of Japan. The complaint under which petitioner is held charges only a violation of this act. It therefore fails to state a public offense as against him.

In view of our conclusion on the matter discussed, it is unnecessary in this case to discuss the claim made under the fourteenth amendment to the constitution of the United States.

It is ordered that the petitioner be discharged from custody.

Shaw, J., Lawlor, J., Wilbur, J., Lennon, J., Shurtleff, J., and Sloane, J., concurred.