[Crim. No. 655.   Third Appellate District.—April 30, 1923.]

## THE PEOPLE, Respondent, v. W. A. COCKRILL et al., Appellants.

[1] ALIEN LAND LAW—CONSPIRACY TO EFFECT TRANSFER OF REAL PROP-
ERTY—PLEADING—SUFFICIENCY OF INDICTMENT.—An indictment for
conspiracy to violate the Alien Land Law alleging that defendants,
one of whom was an alien ineligible to citizenship under the laws
of the United States, conspired "to purchase" certain real property,
instead of alleging, in the language of the statute, conspired "to
effect a transfer" thereof, states an offense against which the stat-
ute inveighs.

[2] CRIMINAL LAW—PLEADING—LANGUAGE OF STATUTE.—In those cases
in which the crime may properly be stated in a criminal pleading
in the exact language of the statute defining it, a departure from
the precise language of the statute in setting forth the crime in
an indictment or information will not have the effect of vitiating
the pleading if the language employed in such pleading describes
the offense sought to be charged with clearness equal to that of
the language of the statute itself.

[3] ALIEN LAND LAW—CONSPIRACY TO PURCHASE REAL PROPERTY—
PLEADING—INDICTMENT—CHARACTER OF PROPERTY.—It is not indis-
pensably essential, to state an offense under the Alien Land Law
for conspiracy, that there should be an allegation in the indictment
that the real property, which it is alleged was purchased by de-
fendants, was agricultural or farming land, or not land which an
alien ineligible to citizenship may acquire for residential or com-
mercial purposes, under the treaty between his country and the
United States.

[4] ID.—PLEADING—INDICTMENT—OBJECT OF PURCHASE.—It is not neces-
sary, in the statement of the offense of conspiring to effect a trans-
fer of real property denounced by section 10 of the Alien Land Law,
to allege that the acquisition of the property was not to be consum-
mated for the purpose of enforcing or satisfying any lien upon real
property at the time of the enactment of the law, as provided by sec-
tion 7.

[5] ID.—AMENDMENT OF INDICTMENT—LACK OF PREJUDICE.—In a prose-
cution for conspiracy to violate the Alien Land Law, the substantial
rights of defendants are not prejudiced by an amendment of the
indictment which does not affect the substance of the crime charged
but merely states the offense or transaction from which it arises in
greater detail.

[6] ID.—INTENT TO AVOID ESCHEAT—CONSIDERATION FOR CONVEYANCE—
PAYMENT BY ALIEN—PRESUMPTION—INSTRUCTION.—In a prosecution
for a violation of the Alien Land Law, it is proper to incorporate in

the charge to the jury the portion of section 9 of the act providing that a *prima facie* presumption that the conveyance is made with intent to avoid escheat shall arise upon proof of the taking of the property in the name of a person other than the persons mentioned in section 2, if the consideration is paid or agreed to be paid by an alien.

[7] ID.—PRESUMPTION OF INTENT TO AVOID ESCHEAT—APPLICABILITY TO CRIMINAL PROSECUTIONS.—The *prima facie* presumption of section 9 of the Alien Land Law that a conveyance is made with intent to evade escheat where the property is taken in the name of a person other than the persons mentioned in section 2 if the consideration is paid by an alien mentioned in section 2 is not limited to civil actions authorized by sections 7 and 8 to be brought for the purpose of securing a decree escheating to the state any real property which has been acquired in violation of the terms of the act, but also applies to criminal prosecutions under the act.

[8] ID.—PRESUMPTION OF INTENT TO AVOID ESCHEAT—CONSTITUTIONAL LAW—TREATY BETWEEN UNITED STATES AND JAPAN.—Such presumption is not amenable to the objection that it denies to any person or class of persons within this state the equal protection of the law guaranteed by section 1 of article XIV of the federal constitution, and is not subject to the criticism that it infringes any rights guaranteed to alien Japanese denizens within this state by article I, paragraph 3, of the treaty of 1911 between the United States and Japan.

[9] CRIMINAL LAW—EVIDENCE—BURDEN UPON DEFENDANT—POWER OF LEGISLATURE — CONSTITUTIONAL LAW. — It is within the constitutional right of the legislature, or of the people, in the exercise of the powers of initiative which they have reserved to themselves, to change any rule of evidence now existing and place upon a defendant in a criminal case, of whatsoever character, a heavier burden in the trial of the charge against him than he is under the existing system required to bear.

[10] ALIEN LAND LAW—PRESUMPTION AS TO INTENT TO AVOID ESCHEAT —BURDEN OF PROOF OF GUILT NOT AFFECTED.—The presumption referred to in section 9 of the Alien Land Law as to intent to avoid escheat was not intended to relieve the people of the burden of proving the guilt of persons prosecuted under section 10 of the act beyond reasonable doubt.

[11] ID.—PRESUMPTION OF INTENT TO AVOID ESCHEAT—EXPLANATORY INSTRUCTION.—In a prosecution under the Alien Land Law, an instruction declaring the *prima facie* presumption provided by section 9 of the law should always be accompanied by an instruction that the burden thus placed upon the defendants charged under section 10 is only such as requires the defendants to introduce evidence sufficient to create a reasonable doubt as to their guilt.

[12] ID.—EVIDENCE—STATEMENTS BEFORE GRAND JURY—DISCUSSIONS OF LAW.—In such a prosecution, it is not prejudicial error to admit in evidence certain statements made by one of the defendants, who was an attorney, before the grand jury relating to the transaction involved, although such statements consisted entirely of discussions between the district attorney, his assistant, some of the grand jurors and defendant as to the meaning of several provisions of the Alien Land Law.

[13] ID.—CONSPIRACY TO VIOLATE ALIEN LAND LAW—SUFFICIENCY OF EVIDENCE. — In this prosecution of an attorney at law and of a native of Japan for the crime of conspiring to cause or effect a transfer of real property to an alien ineligible to citizenship under the laws of the United States in violation of the Alien Land Law, the evidence was sufficient to support the verdict of guilty as to both defendants.

APPEAL from a judgment of the Superior Court of Sonoma County and from an order denying a new trial. Emmet Seawell, Judge. Affirmed.

The facts are stated in the opinion of the court.

Chas. A. Wetmore, Jr., Gillogley, Crofton & Payne and Frank A. Duryea for Appellants.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

HART, J.—The defendants, Cockrill, a lawyer by profession, and Akada, a native of Japan, were indicted by the grand jury of Sonoma County for the crime of conspiring to cause or effect the transfer of real property to an alien ineligible to citizenship under the laws of the United States, in violation of the provisions of an initiative act adopted by the people at the general election held on November 2, 1920 (Stats. 1921, p. lxxxiii), and designated and known as the "Alien Land Law."

The defendants demurred to the indictment on general and special grounds and also moved to set it aside for alleged statutory reasons. The motion was disallowed, but the district attorney, conceding the force of the demurrer in a certain particular, was, upon motion, allowed to amend the indictment. Like proceedings were had as to the amended indictment, and, by leave of the court, the district attorney again amended the indictment, and it was upon

the second amended indictment that the defendants were finally arraigned, tried for and convicted of the crime above stated.

At the time fixed for the arraignment of the defendants for sentence, the latter, through their counsel, interposed a motion in arrest of judgment and also a motion for a new trial, both of which were denied.

The appeal is by the defendants from the judgment and the order denying their aplication for a new trial.

The transaction out of which this prosecution developed took place on the twenty-sixth day of August, 1921, negotiations for its consummation having previously been carried on for several weeks by the defendants with B. C. Souza and Mae C. Souza, his wife, the parties owning the land involved in the transaction. The Souzas were the owners of approximately thirty acres of agricultural land situated near Petaluma, in Sonoma County. When the defendants proposed to purchase the land, the Souzas stated to them that, if the purchase of the land was to be made for Akada himself and the property to be for his own possession, occupation, and use, they did not think that the sale could be made under the law, referring, of course, to the Alien Land Law. Akada and his wife (also a native of Japan) had, prior to the transaction here involved, lived on a farm in Sonoma County for a number of years and during that time several children were born to them, and both Akada and Cockrill declared to the Souzas that the land was to be purchased for the American-born children of said Akada. After considerable discussion of the matter, Cockrill, so the Souzas testified, stated that he had consulted the district attorney of Sonoma County about the transaction and had been advised by that official that if the land was to be purchased for the American-born children of Akada the transaction would be perfectly legal. This statement was positively denied by the district attorney. He testified that no such advice was given by him to Cockrill; that the latter had never consulted him about the matter.

Finally, a written agreement for the purchase of the land, dated the twenty-sixth day of August, 1921, was entered into between the Souzas and the defendant Cockrill whereby the land was sold to the latter for the sum of $2,250. Upon the execution of this agreement Cockrill paid the vendors the

sum of $1.50. The agreement provided that on the execution of a deed and certificate of title to the property the sum of $1,100 was to be paid and that the balance of the purchase price, $1,000, was "to be covered by a mortgage on said property, said mortgage to be held by parties of the first part [the Souzas] or their assigns." The Souzas, as we have stated, testified that the defendants represented to them at all times that the land was to be purchased for and to be owned by the American-born children of the defendant Akada. Akada furnished the money with which the payments on the land were made.

It appears that the abstract of title disclosed some defects in the title, and on September 24, 1921, Cockrill, representing the Souzas as their attorney, commenced a suit to quiet title in the superior court of Sonoma County. There is no question raised here as to the fact that four of the children of Akada, for whom it was claimed by Cockrill and Akada the land was purchased, were of American birth.

After the action to quiet title was commenced Cockrill was subpoenaed to appear before the grand jury to give testimony as to the transaction. Before the inquisitorial body he testified that Akada purchased the property for his American-born children; that the contract of sale was taken in Cockrill's name as trustee for said children, and that the intention was to complete the transaction by taking a deed in the name of said children and then having a guardian of their estates appointed for them.

It appears that at the time of the several transactions herein referred to, while believing that Akada's native-born children could take title to agricultural lands in this state, and that it was not unlawful for him (Akada) to furnish the money for the purchase of such lands for such purpose, Cockrill was of the opinion that an alien Japanese father could not act as guardian of his children's estate and hence "arrangements were made to have an American citizen appointed as such guardian as soon as the title should be found good and the actual transfer made." Parenthetically, we may say that the supreme court in the case of *Estate and Guardianship of Yano,* 188 Cal. 645 [206 Pac. 995], decided subsequently to the transactions above referred to, held that an alien incapable of becoming a citizen of this country may not only furnish the money for the purchase

of agricultural lands for his American-born children, but may also act as guardian of the persons and estate of such children.

There was testimony to the effect that, upon the execution of the agreement of purchase and sale, the defendant Akada commenced to improve the land by erecting thereon a number of buildings which, aside from the one in which he and his family were to reside, were to be used as ''chicken-houses.'' All this testimony was by the court limited in its application to the defendant Akada. There were also admitted in evidence certain statements made by Cockrill and Akada when testifying before the grand jury regarding the transaction involved herein, as was also an extrajudicial statement by Akada relative to said transaction, in which, however, he declared that the property was bought for his children, but in which he gave what appears to be an inconsistent explanation as to the source from which the money used in purchasing the property came. The above statement embraces, substantially, all evidence of material importance introduced by the people in support of the charge. As to the defense, Cockrill's testimony was all that was received in rebuttal of the showing made by the people, Akada not having been called to testify. Cockrill's testimony consisted of an effort on his part to explain that the transaction involving the purchase of the land was carried on in good faith and according to a conscientious interpretation by him of the provisions of the Alien Land Law and that the intention was to purchase the land for Akada's American-born children.

The defendants advance a number of points on which they claim to be entitled to a reversal of the judgment and the order. Most of these points, while involving challenges of the legal soundness of certain given instructions and the action of the court in disallowing others, proposed by defendants, and rulings of the court as to the admissibility of certain evidence, in reality involve an assault upon certain portions of the Alien Land Law upon the ground of their alleged invalidity. These points we will now proceed to consider.

1. The defendants vigorously contend that, in allowing the purported indictment to be amended, the court committed error in this: That the indictment, as originally filed,

did not state an offense under the act in question, and hence no amendment thereof, even if thus an offense under said law was stated, could make it an indictment, since the situation in such case would be as if the grand jury had not found and presented an indictment against the accused.

The authority for the allowance of amendments of indictments and informations is in section 1008 of the Penal Code, so much of which as is apposite to the present consideration reads as follows: ''An indictment or information may be amended by the district attorney without leave of court, at any time before the defendant pleads. Such amendment may be made at any time thereafter, in the discretion of the court, where it can be done without prejudice to the substantial rights of the defendant. An indictment cannot be amended so as to change the offense charged, nor an information so as to charge an offense not shown by the evidence taken at the preliminary examination.''

The particulars in which it is claimed that the indictment as originally filed was insufficient because of the want of facts or in the statement of the offense thereby sought to be charged are as follows:

''First, the indictment did not charge that the land involved was agricultural land or that it was not land which an alien Japanese might acquire for residence or commercial purposes in accordance with the treaty between the United States and Japan;

''Second, the grand jury did not find or charge that the transaction was for the use or benefit in any way of the defendant Akada;

''Third, the grand jury did not find or charge that the land was not to be acquired for the use and benefit of defendant Cockrill, in whose name the contract was taken;

''Fourth, the grand jury did not find or charge that the contract was not taken, or that the land was not to be finally transferred, in satisfaction of any lien thereof.''

Clearly, if the document filed as an indictment in the first instance stated no offense under the Alien Land Law and the purported second amended indictment, upon which the accused were tried, does state such an offense, then it must be held that the purported trial and the conviction of the defendants were *coram non judice* and absolutely void, inasmuch as the document purporting to be the second

amended indictment would be no indictment at all, it not, having been found and presented by the grand jury. Nor could the document stand as an information, since the prerequisites of the filing of an information are wanting. (Secs. 809, 872, Pen. Code.)

The primary question, then, is whether the "original indictment" stated an offense under the Alien Land Law; and this question must be determined upon a consideration of certain provisions of said law and certain provisions of the treaty between this government and the empire of Japan. (37 Stat. 1504.)

The first section of the act in question reads as follows: "All aliens eligible to citizenship under the laws of the United States may acquire, possess, enjoy, transmit and inherit real property, or any interest therein, in this state, in the same manner and to the same extent as citizens of the United States, except as otherwise provided by the laws of this state."

Section 2 provides: "All aliens other than those mentioned in section one of this act may acquire, possess, enjoy and transfer real property, or any interest therein, in this state, in the manner and to the extent and for the purpose prescribed by any treaty now existing between the government of the United States and the nation or country of which such alien is a citizen or subject, and not otherwise."

Section 7 reads in part as follows: "Any real property hereafter acquired in fee in violation of the provisions of this act by any alien mentioned in section 2 of this act or by any company, association or corporation mentioned in section 3 of this act, shall escheat to, and become and remain the property of the State of California. . . . The provisions of this section and of sections 2 and 3 of this act shall not apply to any real property hereafter acquired in the enforcement or in satisfaction of any lien now existing upon, or interest in such property, so long as such real property so acquired shall remain the property of the alien company, association or corporation acquiring the same in such manner. No alien, company, association or corporation mentioned in section 2 or section 3 hereof shall hold for a longer period than two years the possession of any agricultural land acquired in the enforcement of or in satisfaction of a mort-

gage or other lien hereafter made or acquired in good faith to secure a debt.''

The first part of section 8 contains a similar provision as to escheat in relation to any leasehold or other interest in real property less than the fee acquired in violation of the provisions of the act by any alien mentioned in section 2 of said act or by any alien, company, association or corporation mentioned in section 3. There are other provisions in said section which are not material to this inquiry.

Section 10, upon which the indictment herein is predicated, reads as follows: ''If two or more persons conspire to effect a transfer of real property, or of an interest therein, in violation of the provisions hereof, they are punishable by imprisonment in the county jail or state penitentiary not exceeding two years, or by a fine not exceeding five thousand dollars, or both.''

The initial clause of article I of the treaty between the United States and Japan reads as follows: ''The citizens or subjects of each of the high contracting parties shall have liberty to enter, travel and reside in the territories of the other to carry on trade, wholesale and retail, to own or lease and occupy houses, manufactories, warehouses and shops, to employ agents of their choice, to lease land for residential and commercial purposes, and generally to do anything incident to or necessary for trade upon the same terms as native citizens or subjects, submitting themselves to the laws and regulations there established.''

It will be noted that sections 1 and 2 of the Alien Land Law describe and designate the classes of aliens competent to acquire and possess real property in this state, the first including all that class of aliens that are eligible to acquire the rights of citizenship in the United States and the second embracing all aliens, whether they are or are not eligible to citizenship of this country, that are entitled to acquire and possess real property by virtue of the provisions of any treaty between this government and the country of which such aliens are natives guaranteeing such right.

While section 3 is not particularly important to the discussion of the points herein made, it may be explained that it guarantees the right to own real property by such aliens as are not mentioned in sections 1 and 2 as may constitute a majority of the members of any company, association, or

corporation organized under the laws of this state or any other state or nation or who hold a majority of the issued capital stock of said company, etc., and which corporation is authorized to acquire, possess, enjoy, and convey real property or any interest therein in this state, in the manner and to the extent and for the purposes prescribed by any treaty existing at the time of the enactment of said law between the government of the United States and the nation or country of which such members or stockholders are citizens or subjects. Obviously, no other class of aliens ineligible to become citizens of the United States than those classes mentioned in the above sections of the Alien Land Law are entitled to acquire agricultural or farming land in this state.

[1] With this understanding of the provisions of the Alien Land Law and the provisions of the treaty between this government and the government of Japan which are pertinent to the present investigation, we will proceed to an examination of the indictment as it was found and presented by the grand jury to the superior court. That pleading is in the following language:

"W. A. Cockrill and Y. Akado are accused by the Grand Jury of the County of Sonoma, State of California, by this Indictment, found this 15th day of November one thousand nine hundred and twenty-one of the crime of conspiracy to effect a transfer of real property in violation of the Alien Land Law of the State of California, committed as follows:

"The said W. A. Cockrill and Y. Akado on or about the 19th day of September, nineteen hundred and twenty-one, at and in said County of Sonoma, State of California, that the said defendants W. A. Cockrill and Y. Akado did then and there willfully, unlawfully and feloniously conspire together to effect a transfer of real property in the County of Sonoma, State of California, and an interest therein, and did so willfully, unlawfully and feloniously take and enter into an agreement to purchase certain real property from Bartholomeu C. Souza and Mary C. Souza in the name of said defendant W. A. Cockrill and paid thereon on the purchase price thereof the sum of One Hundred and Fifty dollars, lawful money of the United States, which said money so paid on said purchase price was paid by said defendant Y. Akado, said Y. Akado being an alien and a sub-

ject of the Empire of Japan and not being then and there an alien eligible to citizenship under the laws of the United States, and there not being then and there any treaty existing between the Government of the United States and the government of the Empire of Japan providing for the acquiring, possessing, enjoying and transferring real property or any interest therein, contrary to the form, force and effect of the statute in such case made and provided, and against the peace and dignity of the People of the State of California.''

It will be observed that the indictment as it was originally framed, is, substantially, in the language of section 10 upon which it was founded. It is true that the pleader in preparing the indictment used the word ''purchase,'' which is not employed in section 10, in the place of the word ''transfer,'' which is used in said section in defining the offense. In other words, the indictment, in the place of alleging in that portion thereof directly charging the offense, that the defendants unlawfully, etc., did ''conspire to effect a transfer,'' etc., as is the language of section 10, alleges that the defendants did willfully, unlawfully and feloniously take and enter into an agreement ''to *purchase* certain real property,'' etc. **[2]** But, even in those cases in which the crime may properly be stated in a criminal pleading in the exact language of the statute defining it, a departure from the precise language of the statute in setting forth the crime in an indictment or information will not have the effect of vitiating the pleading if the language employed in such pleading describes the offense sought to be so charged with clearness equal to that of the language of the statute itself. The word ''purchase,'' taken alone, and as it is used in the present case, is much more scopeful than would be the word ''transfer,'' taken alone, if it were likewise used. To say that one had effected the transfer of real property without further explanation or amplification of the proposition would be ambiguous as to the persons by whom and to whom the transfer is made. In the present case, for instance, if there was nothing more in the indictment than the allegation that the defendants had formed a conspiracy to effect a transfer of real property contrary to the provisions of the Alien Land Law, the indictment would be obnoxious to the objection of uncertainty and ambiguity. In fact, it

would probably be held not to state an offense under the law. The word "purchase" has a definite and well-understood juridical meaning. Indeed, its meaning in a juridical sense is quite synonymous with its signification as it is colloquially used and understood, and when used for the purpose of characterizing a transaction involving property of any kind it is readily to be understood therefrom that there has been an acquisition by one or more parties of the title to such property. "Purchase," states Webster in his dictionary, means "to acquire; to buy for a price." This is undoubtedly the popular meaning. In law, it "includes every mode of coming to an estate except by inheritance." (*Greer* v. *Blanchar,* 40 Cal. 194, 197.)    In *Marsh* v. *Lott,* 8 Cal. App. 384, 391 [97 Pac. 163], which was a suit for the specific performance of a contract of option to buy real property and in which agreement it was covenanted that the proposed vendee was thereby given "an option to purchase" certain real property, the appellate court had occasion to interpret the word "purchase" as used in such agreement and in explaining the meaning of said word said: "By reference to said agreement, we find that she gave plaintiff an option *to purchase* her property. The word 'purchase' implies the acquisition of; so that he (proposed vendee) was given the right to acquire the property of defendant, which in this case could not be otherwise than by a deed of conveyance."

Thus must it readily be seen that, in alleging that the defendants, one of whom was an alien ineligible to citizenship of this country, conspired to purchase certain real property, the indictment stated an offense against which the statute inveighs. In other words, the sum and substance of the charge as laid in the indictment before its amendment was that the defendants, one an alien legally incapable of becoming a citizen of the United States, and the other, as we may assume from his name, a citizen of this country or, if not already one, a person who is eligible to become such, entered into a conspiracy to effect a transfer to themselves of certain real property, contrary to the terms of the Alien Land Law of the state of California and that, in pursuance of the execution of such conspiracy, they committed two distinct overt acts, to wit: 1. That they entered into a written agreement with the owners of said real property for the

acquisition thereof; 2. That on the execution of said agreement, they paid to the vendors, with money furnished by the alleged alien defendant, the sum of $150 on the purchase price. (Sec. 1104, Pen. Code.) Of course, the indictment necessarily means that the intent of the defendants was to prevent, evade or avoid an escheat as provided in the act.

[3] But, as we have seen, it is urged that, to state an offense under the law in question, it was necessary that there should have been an allegation in the indictment that the real property which it is alleged was purchased by the defendants was agricultural or farming land, or not land which such alien may acquire for residential or commercial purposes. It is to be conceded that, as it was originally framed, the indictment is by no means a model criminal pleading. It is further to be conceded that, since under their treaty rights Japanese aliens may *own* certain houses, manufactories, shops, etc., and which possibly might be susceptible of the construction that thus they are guaranteed the right to own the land upon which such houses, etc., were erected and are maintained, it would have been the result only of the exercise of wisdom if the pleader, in drafting the indictment, had also alleged that the real property which it is charged that the defendants acquired or entered into an agreement to acquire was agricultural or farming land; still, as is to be understood from what we have said above, we do not think that allegation was indispensably essential to the statement of the offense denounced by section 10 of the act. In construing the indictment we must consider section 10, on which it is based, together with the other provisions of the Alien Land Law and the provision of the treaty between this government and the empire of Japan guaranteeing to alien Japanese certain rights as to real property. Thus viewing the indictment, it seems to us that but one conclusion can follow, and that is that the "real property" which that pleading charges the defendants with having conspired to acquire is the "real property" which the act in question declares that an alien ineligible to citizenship of the United States has no right to acquire or own in this state. The defendants could not have understood the indictment to mean anything else and it must, therefore, be held as true, as we have hitherto declared, that the indictment as it was presented to the superior court by the grand jury, while

inartificially phrased, was, in all other respects, sufficient to notify the defendants of the particular offense with which they were charged so that they could not be misled as to its real meaning or placed in such a position as not to be able to meet by any defense they may have the charge of conspiring to effect the transfer of agricultural land to an alien not competent under our laws to become a citizen or acquire the rights of citizenship of the United States. This is all that is required of any criminal pleading. It may be added that the evidence without conflict shows that the "real property" referred to in the indictment was farming land, and that the defendants, from the character of the cross-examination of the witnesses for the prosecution, appeared to have understood that the indictment so charged.

[4] It was not necessary, in the statement of the offense denounced by section 10 of the act in question, to allege that the acquisition of said land was not to be consummated for the purpose of enforcing or satisfying any lien existing upon real property at the time of the enactment of the Alien Land Law. Indeed, the very allegation that the defendants conspired to purchase certain real property itself plainly negatives the existence of the exception relating to the acquisition of real property through the enforcement or satisfaction of any lien or mortgage, provided in section 7 of the Alien Land Law.

[5] The amended indictment added the allegation that the real property concerned herein was agricultural and farming land; that the contract was taken in the name of the defendant Cockrill for the "use, benefit, enjoyment, possession, occupation and control of defendant Akada"; that there was no provision in the treaty between the United States and Japan guaranteeing to Japanese aliens the right to acquire agricultural land. The second amended indictment, in addition to the matters set out in the amended indictment, supplied the omission in the amended indictment to state the time at which the alleged crime was committed; that the said land "was and is not acquired in the enforcement or satisfaction of any lien," etc.; that the land was taken in the name of the defendant Cockrill for the use and benefit of the defendant Akada, "with the intent and for the purpose of preventing, evading and avoiding the escheating of said land and property to the state"; that defendant Cockrill had no interest in the fee of said land or otherwise.

The only material change made by either amendment was that involved in the allegation that the real property which the defendants conspired to have transferred to themselves was "agricultural or farming land." The other changes were not essential to the statement of the offense. We have already disposed of the proposition that the indictment should have alleged that the land was not acquired in the enforcement or satisfaction of any lien, etc. The allegation that Cockrill had no interest in the fee is immaterial, since the indictment, as originally presented, alleged that the land was purchased by him and the defendant Akada, thus showing that Akada himself had acquired an interest in the land and that the purpose of the conspiracy or combination between him and Cockrill was to effect that result with respect to said real property.

It is clear that it cannot be held that the change effected in the indictment by the amendment thereof, as above indicated, affected the substance of the crime charged, but merely resulted in stating the offense or the transaction from which it arose in greater detail. Precisely the same offense as was stated in the indictment as it was originally framed is merely set forth with more particularity in the indictment as amended. The substantial rights of the defendants could not, therefore, have been prejudiced by the amendment. (Sec. 1008, Pen. Code.)

We may add that, since the indictment, both as originally filed and as amended, stated the offense designed to be therein charged and the original indictment appearing to have been found, indorsed, returned, and presented according to the requirements of the law, the motions to set aside the amended and second amended indictment were properly denied. And for the reasons stated above in holding that the indictment, as originally framed, was exempt from the claims of the demurrer thereto, the motion in arrest of judgment was properly denied.

[6] 2. The next assignment which is to be considered is that the court committed error resulting in serious prejudice to the substantial rights of the defendants by incorporating into its charge and thus reading to the jury certain provisions of the Alien Land Law. The provisions made a part of the court's charge to the jury comprehend all of sections

1, 2, and 10 and a portion of section 9 of said act. Sections 1, 2, and 10 are hereinabove reproduced. As to these, as parts of the court's charge, there is no objection suggested. It is, however, objected that it was error from which the defendants sustained serious damage to their substantial rights for the court to have embraced within its charge that portion of section 9 of the act establishing a disputable presumption of the guilt of persons charged under section 10 upon the proof of certain facts. So much of said section as was included within the charge to the jury reads as follows:

"Every transfer of real property, or of an interest therein, though colorable in form, shall be void as to the state and the interest thereby conveyed or sought to be conveyed shall escheat to the state if the property interest involved is of such a character that an alien mentioned in section two hereof is inhibited from acquiring, possessing, enjoying or transferring it, and if the conveyance is made with intent to prevent, evade or avoid escheat as provided for herein. A *prima facie* presumption that the conveyance is made with such intent shall arise upon proof of any of the following groups of facts:

"(a) The taking of the property in the name of a person other than the persons mentioned in section two hereof if the consideration is paid or agreed or understood to be paid by an alien mentioned in section two hereof";

There are three other distinct acts the doing of which, or any one of which, will raise the presumption mentioned. The specific grounds upon which objection is urged against said instruction is: (a) That the said presumption was intended by the legislature to be invoked and applied exclusively in civil actions authorized by sections 7 and 8 of said act to be brought for the purpose of securing a decree escheating to the state any real property or leasehold interest in such property which has been acquired in violation of the terms of the act; (b) That said portion of section 9 is violative of that part of section 1 of article XIV of the constitution of the United States which provides that "no state shall deny to any person within its jurisdiction the equal protection of the law"; (c) That it is in direct contravention of the terms of article I, paragraph 3, of the American-Japanese treaty of 1911; (d) That the provision as to said presump-

tion is invalid because, when given as an instruction to a jury in a case arising under section 10 of the act, it contradicts and destroys the effect of the presumption that all persons accused of public crime are innocent until their guilt is established beyond a reasonable doubt.

[7] (a) The statute does not expressly limit the application of the presumption to any particular action or proceeding which may, by virtue of certain of its provisions, be instituted in the superior court. Nor, as we read the statute, is there any reason arising from the statute itself or from a reasonable construction thereof which inclines us to the belief that it was the legislative intent that the presumption should have application only to civil cases or proceedings in escheat, as authorized by the act.

Section 1102 of the Penal Code provides that: "The rules of evidence in civil actions are applicable also to criminal actions, except as otherwise provided in this code."

We know of no other section or provision of the Penal Code whose language is such as to require the conclusion that the application of the presumption in question should not as well be applied to a criminal as a civil action authorized by the act. Hence, we hold that the presumption was properly stated to the jury in the charge of the court in this case.

[8] (b) and (c) The two propositions thus designated hereinabove may be considered together, since both involve the general contention that the presumption in question is discriminatory in its operation, in that it is applicable alone to cases in which a particular or single class or race of people is proceeded against in this state in an action in the courts of this state. But we think it will require but little reflection and no argument to satisfy any mind unfettered by prejudice against the Alien Land Law or unembarrassed by partisanship in favor of those accused under section 10 in a particular case that, in so far as it applies to criminal cases arising under the act in question, the provision of section 9 as to the conditions upon which the presumption will arise is neither amenable to the objection that it denies to any person or class of persons within this state the equal protection of the law nor subject to the criticism that it infringes any rights guaranteed to alien Japanese denizens within the state of California by article I, paragraph 3, of

the treaty of 1911 between our government and Japan. The
only criminal proceeding authorized by the act is that which
may arise under section 10 thereof, and that section is, it
will be observed, sweeping in its scope. It excepts no one
from its operative effect, but by its very language is made
to apply to all persons, regardless of their race, nativity, or
color. If two or more American-born citizens were to con-
spire to do the act or acts inhibited by said section their
conduct in that regard would clearly fall within the con-
demnation of the section. Indeed, no better illustration of
the legal soundness of this proposition can be found than in
the instant case, in which, as we have reason to know, one
of the accused is a native of the United States. In its ap-
plication to criminal cases arising under section 10 of the
act, the *prima facie* presumption which may arise under the
conditions indicated by section 9 is, in its scope and effect,
coextensive only with the scope of section 10. The presump-
tion, therefore, as a rule of evidence, necessarily applies alike
to all persons, irrespective of nativity, race, or color, who by
their conduct come within the ban of section 10. It follows,
then, that the rule as to the presumption is not in anywise
or in any sense discriminatory as against any class or race
of people or violative of any treaty rights of alien Japanese
residing in this state.

The proposition decided in *In re Terui,* 187 Cal. 20 [17
A. L. R. 630, 200 Pac. 954], cited by the appellants, bears
no relationship in a legal sense to the points here under con-
sideration. In that case, the supreme court had before it
the question of the constitutionality of an act of the legisla-
ture of 1921 (Stats. 1921, p. 613) imposing upon and exact-
ing from "every alien male inhabitant of this state over
twenty-one years of age and under sixty years of age" ex-
cept certain enumerated incompetents, the payment of an
annual poll or head tax of ten dollars. Former Chief Jus-
tice Angellotti, voicing the views of the court, held, as quite
obviously no other conclusion could justly be announced
under such circumstances, that, quoting from the syllabi:

"In view of the provisions of the existing treaty between
the United States and Japan, providing, among other things,
that the citizens or subjects of neither shall be compelled,
under any pretext whatever, to pay any charges or taxes
other or higher than those that are or may be paid by native

citizens or subjects, the alien poll tax law of California is ineffective for any purpose with relation to any citizen of Japan.''

This is all that was decided in the Terui case and thus readily is it to be perceived that, as stated, it has no application to or bearing upon the points here under discussion.

(d) Finally it is said, as we have seen, that the effect of embracing the presumption in an instruction addressed to a jury in a criminal action based on section 10 is to shift the burden of proof to the accused and so nullify the effect of the rule that the presumption of innocence abides with a defendant in a criminal case until the jury, from the evidence, has been convinced of his guilt beyond all reasonable doubt.

[9] It will not be denied that, if it be within the competence of the legislature, in the exercise of its powers under the constitution, to establish such a rule of evidence as is involved in the *prima facie* presumption under consideration, a trial court may, if by so doing it does not enter upon the domain of fact, instruct the jury as a matter of law that such presumption will arise upon the proof of a certain fact or group of facts in any criminal case to which it is applicable. And we know of no constitutional restriction upon the legislature to create or establish any rule of evidence whose effect, when applied, is not to deny to any person accused of crime a trial by due process of law. Indeed, it is in our opinion within the constitutional right of the legislature, or of the people, in the exercise of the powers of initiative which they have reserved to themselves, to change any rule of evidence now existing and place upon a defendant in a criminal case, of whatsoever character, a heavier burden in the trial of the charge against him than he is under the existing system required to bear.

[10] But we do not understand that the presumption referred to was intended to relieve the people of the burden of proving the guilt of persons prosecuted under section 10 of the act beyond every reasonable doubt; nor do we think, when properly applied, the presumption will have that effect. It is a mere disputable presumption, the effect of which is to be overcome by such evidence only presented by the defendants as will be sufficient to create a reasonable doubt of their guilt. Its meaning is simply this: That, after the people have shown by sufficient evidence, either direct or

circumstantial, that the persons charged have by their joint acts effected a transfer of farming or agricultural land to an alien ineligible to become a citizen of the United States, then it rests with those persons to explain the transaction consistently with good faith and honest intentions or that the combination was formed with no intention to effect the wrongful result which their acts may appear upon their face to have brought about. The "burden" is neither in principle nor degree different from that imposed by the law on a person charged with the crime of murder. Section 1105 of the Penal Code provides: "Upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable."

The above section, which obviously casts upon a defendant in a murder case the burden of a certain degree, after the homicide has been shown by the people to have been committed by him, has in innumerable cases been held to represent a perfectly valid exercise of legislative power. But by it there was no intention in the legislature to say that the burden of proving the defendant's guilt beyond a reasonable doubt was not still upon the people, the *quantum* of evidence which he was required to present to support that burden being such only as would or will raise a reasonable doubt of his guilt of the crime of murder. (*People* v. *Bushton,* 80 Cal. 160, 164 [22 Pac. 127, 549]; *People* v. *Boling,* 83 Cal. 380, 382 [23 Pac. 421]; *People* v. *Ah Gee Yung,* 86 Cal. 144, 146 [24 Pac. 860]; *People* v. *Newcomer,* 118 Cal. 263, 271 [50 Pac. 405]; *People* v. *Rodriguez,* 182 Cal. 197 [187 Pac. 423].) **[11]** It should be suggested in this connection that an instruction to a jury declaring the *prima facie* presumption provided by section 9 of the act should always be accompanied by an instruction that the burden thus placed upon the defendants charged under section 10 of the act was only such as required the defendants to introduce evidence sufficient to create a reasonable doubt of their guilt.

It is, however, clear from its charge to the jury in the instant case, that the trial court did not regard the burden

cast upon the defendants by the presumption in question as amounting to more than a demand upon them, in sustaining the burden, to introduce such evidence only as would create a reasonable doubt of their guilt of the offense charged. The court explicitly instructed the jury that the burden of proving the guilt of the defendants was upon the people and that "every essential fact, or every essential to a conviction, must be established beyond a reasonable doubt and to a moral certainty"; that upon the plea entered by the defendants of not guilty to the indictment, the presumption of innocence arose and that said presumption "accompanies the defendants throughout the trial, and goes with you in your retirement to the jury-room to deliberate upon your verdict. It will avail to acquit the defendants unless it be overcome by sufficient proof of guilt. You must examine the evidence by the light of that presumption, and unless, upon examining it, you find it sufficiently strong to overcome the presumption of innocence, to remove it and, moreover, to satisfy you of the defendants' guilt beyond all reasonable doubt and to a moral certainty, they would be entitled to an acquittal at your hands." Again, in another part of the charge, the court further instructed the jury that "the law presumes every man to be innocent until his guilt is established beyond a reasonable doubt and this presumption attaches at every stage of the case, and to every fact essential to a conviction." These instructions certainly were sufficient to convey to the mind of any intelligent man or woman that the *prima facie* presumption arising upon a proof of certain facts in connection with the transaction culminating in the execution of the alleged conspiracy does not have the effect of attaching to the defendants any further burden than that of creating by the introduction of testimony in rebuttal of the presumption a reasonable doubt of their guilt.

The court's action in giving and refusing to give other instructions is criticised. It is not necessary to give these assignments special attention herein for the reason that the court's charge covered every important principle pertinent to the case. Every principle embraced in the instructions proposed by the defendants but rejected by the court was covered by the court's charge. The criticism of certain other given instructions than the one embracing a statement

of certain provisions of the Alien Land Law and above considered, we find, upon a careful examination thereof, is without merit.

[12] 3. The court allowed the district attorney to introduce before the trial jury certain alleged statements made by the defendant Cockrill before the grand jury relating to the transaction herein involved. This testimony was limited in its effect to the defendant Cockrill. Counsel for the defendants stated that they had no objection to offer to the introduction of any portions of the statement made by Cockrill before the grand jury which involved the facts of said transaction. It transpired, however, that the alleged "statement" consisted entirely of a discussion between the district attorney, his assistant, Cockrill, and some of the grand jurors as to the meaning of the several provisions of the Alien Land Law. To these matters counsel for the defendants vigorously objected. But the court, while stating that they involved mere matters of argument as to the meaning of the law, permitted them to go into the record and before the jury, saying that they were only argumentative and so were innocuous in their effect upon the rights of the defendants and were so intermingled with certain facts testified to by Cockrill before the grand jury which the people were entitled to introduce before the trial jury that they could not be segregated from the facts without much waste of time and great inconvenience. We have given this assignment serious consideration and thus have not been able to persuade ourselves that the introduction of those matters before the jury exercised any baleful effect upon the rights of the accused. Of course, those matters should not have been permitted to be introduced into the case and should have been stricken from the record, but the opinions expressed by Cockrill, the district attorney, his assistant and some of the jurors as to the meaning of the provisions of the Alien Land Law corresponded in a measure with the statement of the law by the court in its charge to the jury. Besides, the record shows that counsel on both sides, in their arguments before the jury, read and gave their respective interpretations of the provisions of said law applicable to the case. There was no expression by either the district attorney, his assistant or any of the grand jurors contained in the alleged statement of Cockrill before the grand jury upon

the question of the guilt or innocence of the defendants. Moreover, Cockrill, when asked by the district attorney or his assistant or any grand juror a question calling for his opinion as to the meaning of certain provisions of the law, invariably answered and gave his conception of the meaning of said provisions. While these are our views with respect to the admission of the matters referred to in evidence, we are not prepared to deny that there is some force in a suggestion made by the court, when ruling upon the question of the admissibility of Cockrill's testimony before the grand jury, that the discussion of the provisions of the Alien Land Law by the parties named before the grand jury and thus securing the opinion of Cockrill regarding certain provisions thereof might have been construed to disclose his real state of mind with regard to the transaction—that is to say, it may well be regarded as tending to reveal in a measure his real intentions relative to that matter. In that view the discussion between Cockrill and others before the grand jury as to the meaning of certain provisions of the law would be admissible in evidence at the trial as against him.

[13] It is lastly contended that the evidence is wholly insufficient to support the verdict, particularly as to the defendant Cockrill. We have above given herein the substance of the evidence introduced by the people and directly addressed to the proof of the charge. Laying aside, for the moment, the instruction containing the provision of the act as to the *prima facie* presumption arising upon the proof of certain facts or the doing of certain acts, it is clear to our minds that the evidence directly presented by the people was such that it would be an unwarranted interference with the province of the jury for a reviewing court to declare that the conclusion arrived at by the jury was not fortified by sufficient proof. In addition to the admitted facts (above referred to) that Akada furnished the money which was paid on the purchase price and that Cockrill took the contract of sale in his name, is the testimony of the Souzas that, prior to the time at which Cockrill appeared in the transaction, Akada undertook to negotiate the purchase of the property for himself. Explicitly did B. C. Souza so testify, and further testified that he (Souza) told Akada at that time that he could not sell the land to an alien Japanese and advised Akada to consult an attorney. It further ap-

pears from the testimony of said Souza (and this is not contradicted) that immediately upon the execution of the contract of sale and the payments required thereby being made, Akada himself took possession of the property, although the contract was still in Cockrill's name. And here we may pause to suggest that the jury were well justified in viewing (and we may assume in support of the verdict that they did so view it) the fact of the taking possession of the land by Akada immediately upon the execution of the contract of sale as reflecting the purpose or intent of the defendants while prosecuting the negotiations for the purchase of the land; that the real intention of the defendants was to purchase the land for Akada and to take it in Cockrill's name as a mere camouflage of such intent. It also appears that no steps had been taken by Cockrill or Akada after the execution of the agreement and Akada took possession of the property to secure the appointment of a guardian for the latter's children. As stated above, Akada, in a conversation with certain parties, after the contract was executed, but prior to the execution of the conveyance of the land according to the terms of the agreement, declared that the money with which certain payments were made on the purchase price belonged to his children, the eldest of whom was about seven years of age, but could not, or at least did not, make a satisfactory explanation as to where or how they kept the money. He also stated that he was going to live on the land with the boy and "run it." Then there was the testimony of the Souzas that, prior to the execution of the agreement of sale, Cockrill said to them that he had consulted the district attorney of Sonoma County about that particular case, and that that official told him (Cockrill) that it was a valid transaction, and, as seen, the denial of the district attorney that he ever gave any such advice to Cockrill or that the latter ever consulted him about said transaction.

Thus it is clear that there was sufficient evidence introduced by the people, if credited or believed by the jury, as the verdict shows that it was, to warrant a verdict of guilty as to both defendants. It is true that Cockrill's testimony tended to contradict the bad faith or any wrongful motive at the bottom of the transaction which is to be implied from the testimony presented by the people. It is

also true that Cockrill explained, as to the statement of the Souzas that he said to them that he had consulted the district attorney about this particular case, that, when speaking to the Souzas of his interview with said official, he had reference, and so explained to the Souzas, to another and entirely different case. But it was obviously with the jury to accept the stories of the Souzas on all the matters as to which they testified and reject the testimony of Cockrill as to any matters to which he testified. This they evidently did.

But, as we have seen, a *prima facie* presumption of guilt arose upon the uncontradicted fact that Akada, being an alien, ineligible to become a citizen of the United States, furnished the money with which payments upon the purchase price of the land were made. If there had been no other testimony introduced after the proof or the admission of this fact—if, in other words, the defense had introduced no proof whatever or made no attempt to make a showing in rebuttal of the presumption referred to—it would have been the duty of the jury under the law to return a verdict of guilty. As we have shown, however, there is plenty of testimony in the record which strengthens and supports the presumption.

We have now given painstaking consideration to the points advanced against the validity of the judgment and the order appealed from and, as must be apparent from the foregoing discussion, have found no just legal reason for disturbing either.

The judgment and the order are, accordingly, affirmed.

Burnett, J., and Finch, P. J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on June 28, 1923.

Seawell, J., having been trial judge, did not participate in denial of hearing in supreme court.